ANNA JAMISON, AGNES JAMISON and LAURA JAMISON v. The last will and testament of THOMAS JAMISON, deceased.

IT is now the settled practice of the court that in all issues of *devisavit vel non*, the burden of showing it to be the last will of the deceased, is on the party setting up the will and that such party is entitled to the opening and conclusion.

The question of a testator's capacity to make a will is to be decided by the jury solely by the facts which the testimony in the case discloses. And upon that question the opinions of the subscribing witnesses to the will, if they are persons of intelligence and veracity, are entitled to great weight. Other witnesses may testify to the behavior, conduct, conversation, the appearance of the testator, and to particular facts

tending to throw light on the state of his mind and from which its condition can be fairly inferred ; but they cannot testify to their opinions merely, of his capacity, without also stating the facts upon which that opinion is founded, and if the facts do not fully and clearly warrant that opinion, the opinion must go for nothing, for it is the facts, and not the opinion, upon which the jury must rely in forming their judgment.
Medical witnesses may also testify as to the effect of disease on the mind, and their opinions on the question of mental capacity may be given in evidence ; but the value and weight of such testimony must necessarily depend upon their character and standing, and their learning, ability and experience in their profession ; but in a case where the testimony of such witnesses is conflicting, as the jury cannot safely undertake to decide between them, or to reconcile this conflict, their opinions are entitled to but little, if any weight.
Intellectual feebleness alone, or mere weakness of the understanding, or a partial failure of mind or memory, even a failure of mind or memory to a considerable extent, whether it be natural or the result of an injury, or of disease, or arises from an atthck of apoplexy or paralysis, or from any other cause, is not of itself a sufficient ground for setting aside a will, if there still remains sufficient mind and memory to enable the testator to comprehend and understand what he is about, or what he is doing. If he is able to understand that he is disposing of his estate by his will and to whom he is disposing of it, however weak his intellect may be, he is able and competent to make a will. The question is not so much as to the degree of mind or memory possessed by the testator, as this : was he capable of recollecting what property he was disposing of, and to whom he was disposing of it ? In a word, were his mind and memory sufficiently sound to enable the testator to know and understand the business in which he was engaged at the time when he executed his will ? If they were, then he was capable of making it, and it was his will.

THIS was an issue of *devisavit vel non* from the Register of Wills for New Castle County, on a caveat filed by the contestants against it, whether the paper writing thereunto annexed and purporting to be the last will and testament of Thomas Jamison was or was not his last will and testament. The original will had been duly and formally executed, but in a few days after his death, the executor who had it in his possession, was invited to the house by his daughters, Anna and Agnes, with the request that he would read the will to them, with which he complied, but whilst seated near the stove in the act of reading it to them, it was suddenly snatched from his hands, thrown into the fire and entirely consumed. It had been drawn, however, by

his counsel, Charles B. Lore, Esq. about six months previous to the death of the deceased, who had retained in his possession his first draft of it prepared from written instructions received from the deceased, and which with the exception of the executory or concluding portion of it, was a correct copy of the will executed and burnt as before stated ; and it was this copy in the handwriting of Mr. Lore, which had been produced and presented by the executor before the Register, and which had been sent up with the issue by him to try whether it was his last will and testament. But after the testimony of Mr. Lore had been taken before the court in regard to it, and the proof of the formal execution of the original will by the testator by the examination of the testamentary witnesses to it, and of its subsequent destruction as before stated by the testimony of the executor, it was allowed to go in evidence to the jury, without any question as to its sufficiency or admissibility.

*Gordon for the caveators.* We admit the formal execution of the will and that it was destroyed, and that the copy here produced and sent up by the Register with the issue, is a correct copy of it. The only question therefore, which we intend to present after admitting that, is whether the instrument purporting to be the last will and testament of Thomas Jamison deceased, and which was destroyed after its execution and after his death, was, or was not, his last will and testament ? We say it was not. In the month of February 1863, he was stricken down and prostrated very nearly unto death by a violent attack of paralysis, and we shall be prepared to show by a large number of respectable and intelligent witnesses who were well acquainted with him both before and afterward, that if his mind and memory were not totally annihilated by it, they were so far weakened, impaired and shattered by it, as to render him utterly incapable of making a valid last will and testament, and even of transacting the most simple and ordinary kind of business, and that he had repeatedly so declared himself in regard to such business transactions on several occasions.

His estate would also be proved to amount to over one hundred thousand dollars, with six children and heirs at law, three sons and three daughters, all of them members of his household when the instrument was executed and up to the time of his death, equally dutiful and affectionate to him, and equally sharing to all appearances, the love and affection of a kind but infirm and afflicted father up to the last moments of his life. He had no wife and had been a widower for many years, and upon his eldest daughter in particular, had devolved not only the chief duty of taking care of him and of his household affairs, but of paying all his little bills, counting his money and taking receipts for him, even to the smallest amounts, because he had neither the mind nor the memory to trust himself to perform, or to attempt to attend to even such trifling transactions. And yet under the provisions and dispositions of this instrument, each one of these daughters is to receive out of his estate only about six thousand dollars, whilst the three sons are to have the balance, or more than four-fifths of the whole amount of it. Such an unequal and unrighteous partition and distribution among his three sons and three daughters, could not have been made or dictated by such a man and such a father as Thomas Jamison was, when in his right mind; and such a thing could only be explained or accouted for by the evidence which would be produced in regard to his mental or physical condition at the time.

As usual in such cases, the testimony was equally positive and pointed upon either side in relation to the mental capacity of the deceased to make a will at that time. The testimony of the physician who was called to attend him on the occasion of his attack and afterward, until he was sufficiently restored to dispense with his professional services, said it consisted of a total paralysis of his left side, and was followed with a softening of the brain, and was positive in his opinion that his mind and memory had been so much impaired by it, that he was never afterward capable of making a will ; and several others who had known him well, both before and after his attack, related

facts and circumstances and upon them expressed opinions equally strong and positive to the same effect, whilst physicians examined upon the other side, expressed the abstract opinion without having seen him, that softening of the brain neither necessarily nor usually follows an attack of paralysis, and witnesses upon the same side after stating the facts on which they had formed them, expressed opinions in regard to the matter, quite as strong and decided the other way. The testamentary witnesses were also clearly of the latter opinion and belief when they attested the will.

*Gordon*, after the examination of the witnesses was closed, said that as the counsel for the caveators in the case did not pretend to controvert or dispute the formal execution, or *factum* of the instrument in question, and their only effort and object had been to impeach and invalidate it on the ground that the deceased had not sufficient mind and memory, in contemplation of law at the time, to make a will, they considered the burden of showing that to the satisfaction of the jury, necessarily devolved upon them, and that they were consequently entitled to the opening and conclusion of the argument in the case before them; and if the court was not prepared so to decide, they would like to be heard upon the question, before it was decided, for the rulings and practice in this court in similar cases had sanctioned it.

*The Court, Gilpin, C. J.* We do not wish to hear that question argued. This court decided it in two cases at the late term in Kent county. That is to say, we decided that the *onus probandi* or burden of proving the instrument propounded, to be the last will and testament of the deceased in any case, rests on the party propounding and setting it up, and that such party therefore had the right to open and conclude the argument. And that that decision was made on principle and in accordance with all the authorities; and although there may have been a former ruling of the

principle to the contrary in this court, it was wrong, and we then intended and still intend to correct and reverse and overrule it. And such is now our purpose.

*Houston J.* As I did not sit in that court and had not the advantage of hearing the argument in either of the cases referred to, if it were now an open question here and the opinion of the majority of the court just announced in this case did not preclude it, I would myself be quite willing to hear the question now argued.

*T. F. Bayard, for the Administrator pendente lite,* asked the court to charge the jury that the presumption of law is in favor of the capacity of the testator at the time of making his will, and that every man is presumed to be sane, and, of course, of a sound, disposing mind and memory, until the contrary is shown. 1 *Jarm. on Wills* 72. 2 *Phil. Ev.* 293. *Duffield v. Morris' Exr.* 2 *Harr.* 379. Nor was it necessary to prove, if the mind had been enfeebled or impaired by disease or otherwise, that it had been restored to its original strength and soundness, in order to enable him to make a good and valid last will and testament; for all that was required in such a case was to show, that he was at the time of a sound and disposing mind, but not that his mind was as strong and vigorous as it had been before it became so affected by disease or other accident. 3 *Phil. Ev.* 394. Nor was it a question whether the testator was capable of making such a will as was then before the court and jury, but whether he was capable of making a will simply. He must, in the language of the law, have at the time a sound and disposing mind and memory, so as to be able to dispose of his property by will; or in other words, he ought to be capable of making his will with an understanding of the nature of the business in which he is engaged, with a recollection of the property he means to dispose of, of the persons who are the objects of his bounty, and the manner in which it is to be distributed between them. It is not necessary that he should view his will with the eye of a law-

yer, and comprehend its provisions in their legal form; but it is sufficient if he has such a mind and memory as to enable him to understand the elements of which it is composed, that it is to say, the disposition of his property in its simple forms. To determine the capacity of a person to make a will, it is soundness of mind, and not of the body, or the particular state of his body or health at the time, that is to be looked to, for the latter may be in a state of great debility, or of extreme imbecility, and yet he may have sufficient understanding and strength of mind at the same time to direct how his property is to go, or be disposed of after his death, and strength of body to write or execute a will. He must have memory it is true, and yet it may be very imperfect; it may be impaired by age, or disease; he may not be able, at all times, to remember the names of persons with whom he has been intimate; he may at times ask idle questions and repeat those which have before been asked and answered, and yet his understanding be sufficiently sound for many of the ordinary transactions of life; he may not have sufficient strength of mind and memory to make and comprehend all the parts of a contract, and yet be competent to make a will. 1 *Jarm. on Wills*, 51, 52, 53. *Harrison v. Rowan*, 3 *Wash.* 580. *Stevens v. Vancleve*, 4 *Wash.* 262. *Sutton v. Sutton*, 5 *Harr.* 461. *Maslen v. Anderson*, 2 *Harr.* 381, *in note.* And the incapacity of the testator must be shown to have existed at the time when the will was made, and not before, or afterward. 3 *Wash.* 586. 4 *Wash.* 268. 2 *Harr.* 333. 1 *Jarm. on Wills*, 77. As to the comparative weight of testimony and the opinions expressed by witnesses, the opinions on that subject of the testamentary witnesses to the will, were not only entitled to much greater weight than those of other witnesses, but the opinions of the latter as opinions merely, were entitled to no weight whatever in the case. 1 *Jarm.* 72, 73. 4 *Wash.* 268. 3 *Wash.* 586, 587. 2 *Harr.* 381.

*D. M. Bates, for the Caveators.* The fact that the statute requires among other things, that a person shall be twen-

ty-one years of age to make a will, necessarily imports and implies that he must have at the time of doing so, some degree of knowledge, judgment and discretion and maturity of reason beyond what is meant, and, of course, understood to be, soundness of mind and memory merely. A person at the age of sixteen, eighteen or twenty years, may be endowed in point of fact, with a sound, disposing mind and memory, and may be competent to make a wise and judicious disposition of his property upon his death even at such a period of his life, and yet he cannot, under the statute, make a last will and testament. These terms " sound disposing mind and memory " employed in the statute, therefore necessarily import or imply something more than mere soundness of mind or memory, and which signify, as much as if it had been expressed in so many words, that he shall be endowed with an unqustionable mental capacity, to make such a final and solemn disposition of all the property which he possesses and is about to leave behind him when he departs from this world. It was observed by Sir John Nicholl, in a recent case, that it is a great, but not an uncommon error, to suppose that because a person can understand a question put to him, and can give a rational answer to it, he is of perfect, sound mind, and is capable of making a will for any purpose whatever, when the rule of law, and also the rule of common sense, is far otherwise; the competency of mind must be judged of by the nature of the act to be done and from a consideration of all the circumstances of the case. In *Combe's Case*, it was agreed by the Judges that the sane memory for the making of a will, is not at all times when the party can answer to any thing with sense, but he ought to have judgment to discern and to be of perfect memory, otherwise the will is void. Again, according to Lord Coke, it is not sufficient that the testator has a memory when he makes a will, to answer familiar and usual questions, but he ought to have a disposing memory, so that he is able to make a disposition of his lands with understanding and reason; and that is such a memory as the

law calls sane and perfect.   And it was not necessary to go so far as to make a man absolutely insane, so as to be an object for a commission of lunacy, in order to determine the question whether the testator was of sound and disposing memory and understanding; a man perhaps, might not be insane, and yet not equal to the important act of disposing of his property by will.  *Shelf. on Lun.* 2 *Law Libr.* 174.   That a testator is capable of answering ordinary and familiar questions, is not sufficient proof of disposing mind and memory, because to constitute such, it is necessary there be an understanding judgment fit to direct an estate. 1 *Swin.* 118 *in note.*   That in the examination of wills the soundness or unsoundness of mind and memory on the part of the testator, was always a question of fact to be decided by the jury, and to be decided by them upon the whole evidence, according to the plain principles of common sense, unembarrassed by technical language, or unintelligible rules.   The terms sound and disposing mind and memory, stood opposed not only to idiocy and lunacy, but to all derangement of mind occasioned by melancholy, grief, sorrow, misfortune, sickness or disease.  It was true, however, that every discomposure of the mind by these causes, would not render a person incapable of making a will, but it must be such a discomposure or derangement as deprives him of the rational faculties common to men.   The term sound in this connection, signifies whole, unbroken, unimpaired, unshattered by disease or otherwise.  A sound and disposing mind and memory means a mind and memory which have the capacity of recollecting, discerning and feeling the relations, connections and obligations of family and blood.   *Den v. Johnson,* 2 *South. Rep.* 455, 458.  A person to be capable of making a will must be of a sound disposing mind and memory, so as to be capable of a testamentary disposition of his property with sense and judgment, in reference to the situation and amount of such property and to the relative claims of the different persons who are, or might be the objects of his bounty; and where the derangement, or loss,

or unsoundness of the powers of the mind some time previous to the making of the will from disease is established, the weight or burthen of proof is thrown upon the party who seeks to maintain the will, to show that such incapacity had ceased at the time of making it, and when the will itself is unreasonable on its face, when taken in connection with the amount of the testator's property and the situation of his relations, it is always proper evidence to be taken into consideration in judging of the state of the testator's mind. *Clark et al. v. Fisher*, 1 *Paige's Rep.* 171. As to an insane or an unsound mind from any cause whatever, he would go further and say that where the will on its face is unreasonable and unnatural in its provisions and contrary to the natural instincts and affections of the testator and to all his past life and conduct before his mind became so affected, as where he has conceived without any actual or adequate cause for it, such an irrational indifference in regard to or a morbid antipathy against his daughters, or any other sex, or class of his children, as to disinherit such children, or to cut them off with a small and insufficient portion, out of an estate amply sufficient to provide them all with a liberal and handsome maintenance, such an extraordinary antipathy, prejudice, or indifference, and such an extraordinary and unnatural disposition of his property in the last will and testament of an aged, infirm diseased and afflicted father, would of itself exhibit clear and conclusive evidence that his mind on that subject at least, was unsound, and that he must have been at the time the victim of an insane delusion with regard to them, which would be sufficient unquestionably, to invalidate any will made under the dominion and influence of it; and it was so considered and decided in the case of *Dew v. Clark*, 2 *Eng. Eccles. Rep.* 436.

*Gordon*, followed, but confined his remarks exclusively to the facts in the case and the evidence before the jury.

*T. F. Bayard*, replied both upon the law and the facts

of the case, and in regard to the decision in the case of
*Den v. Johnson*, 2 *South. Rep.* 455, cited what was said of it
in *Sloan v. Maxwell et al.* 2 *Green's Ch. Rep.* 568, 569, 570.

*The Court, Gilpin, C. J., charged the jury.* Thomas Jami-
son, a citizen of this County, aged fifty-six years or there-
about, applied in the Spring of the year 1864 to Charles B.
Lore, Esq., a member of the bar of this State to prepare a
will for him.

On the 26th of May of that year, Mr. Lore proceeded
to the residence of Mr. Jamison in St. Georges Hundred,
in order to take his instructions in regard to the disposi-
tion which he proposed to make of his estate, and having
heard from him these instructions, and taken them down
in pencil, he returned to his home in the city of Wilming-
ton, drew out the will in form, and transmitted it to the
testator by mail on the 30th of the same month.

On the *third* of June 1864 Mr. Lore again proceeded to
the residence of the testator and having then and there
read over the will to him, in the presence of Eli Biddle and
explained its provisions, the testator then executed the
will in the presence of Messrs. Lore and Biddle, and they
subscribed their names thereto in his presence, as attest-
ing witnesses. The will so executed was then placed in
an envelope by the testator and handed to Eli Biddle for
safe keeping. The testator died on the 8th of Dec. 1864.
After his death, Mr. Biddle delivered the will to Mr. Cra-
ven the executor, and they went to the late residence of
the testator, and read the will in the presence of his three
daughters.

The will was afterward destroyed. The executor then
took proceeding before the Register, to have the will es-
tablished by proof of its execution, and of its contents;
and for the latter purpose, he gave in evidence a *copy* of
the original, which, after mature consideration, the Regis-
ter adjudged to be *a true copy* of the will that had been de-
stroyed. But the *probate* of the will being resisted on the
ground of the mental incapacity of the testator to make a

valid will, the Register, as he had a right to, has seen fit to send to this court the issue, you are now.trying. The meaning of that issue is this,—Whether, the paper writing purporting to be the last will and testament of Thomas Jamison, deceased, a true copy of which is before you, *is*, or *is not*, his last will and testament. That *issue* brings up the question of his *capacity* to make a will. The statute law of this state declares that any person of the age of twenty-one years, or upward, *of sound and disposing mind and memory*, married women excepted, may make a will.

What is the meaning of the terms employed in our law, "a sound disposing mind and memory?"—and how is the question to be decided?

This question, it seems to me can not be properly determined by any metaphysical theory that we know of, for these are mainly mere theoretical speculations, and are very difficult of comprehension by the common mind, uneducated as it is in the subtleties and niceties of what is called moral philosophy. Nor can it be settled by conjecture, or the mere opinions of the witnesses.

On the contrary, the question is to be decided *solely*, and *only*, by the facts which the testimony in the case discloses. You, gentlemen, are special jurors, carefully selected by the parties. And in considering these facts, you are imperatively called upon, as men of common sense, to exercise your best judgment in deciding the issue before you.

Medical witnesses, however well educated and however well acquainted with the anatomy of the body, and with man's physical condition, are, nevertheless unable to throw much *light* on the nature of the mind, or the mode of its operations.

What is mind? This is a question of difficult, if not impossible, solution. We know better what it is not, than what it really is in its essential nature. It may be said to be, the intellectual or intelligent power in man, which conceives, reflects, reasons, and judges. It is the thinking principle,—and it would seem to be, the great and essential element of man's spiritual nature. The brain is a pul-

py mass, with innumerable little threads running through it, called nerves, and extending thence, like electric wires, to every part of the body.

But let me say to you in passing, that the brain is not the mind,—nor does any other organ or all the other organs of the body together, constitute the mind.

Revelation teaches, if it teaches any thing, that the mind in itself, apart from its external manifestations, is a vital, living, substantial, and immortal entity, and that like life, it is the special endowment or gift of God.

The brain and the other organs of the body, together with the blood, the viscera, the nervous fluids, and the nervous fibres are but the instruments by and through which the mind operates and manifests itself to others, and to the external world around it.

We often say, that a man has lost his mind—but this is not strictly so. It is but the appearance, and not the actual reality,—the mind exists, and will continue to exist forever.

But the machinery and the operations of the mind, may become deranged, so that the mind can no longer manifest truly its thoughts, its wishes, its will, or purposes.

You will, however, gentlemen, in dealing with this case, divest your minds of all metaphysical notions—all mere theories—and confine your attention exclusively to the facts established by the testimony : because, for all the purposes of this life, we deal with the mind, and judge of its strength or weakness, its wisdom or folly, its sanity or imbecility, its soundness or unsoundness, according to its manifestations to us and others, in the affairs and business of this world.

For all the interests and purposes of this transitory life, the utmost scope of man's mental vision is confined to external manifestations lying within the domain of nature.— God, who is the infinite wisdom, who looks upon the heart, and reads the very thoughts of men, judges, doubtless, by an infinitely perfect and infallible rule. But man cannot; for he has nothing else, but the external manifes-

tations of the mind, to enlighten him upon the question of its capacity.

It is therefore to the words, the conversations, the appearance, the acts and doings, the conduct and behavior of the man we are to look to ascertain the state of his mind; these alone, are to us, the external, visible and natural signs, or indications, of his mental condition. And, therefore, in this case, as in all other cases of like nature, the question of capacity must be determined from the facts and circumstances disclosed, and established by the evidence. In examining and weighing that evidence, you will carefully consider the character of the several witnesses, for veracity and integrity,—their bias, on the one side, or on the other, if any,—their intelligence and judgment, and their respective opportunities and powers of observation. And here, it is but proper I should say to you, that the law makes a distinction between the subscribing witnesses to the Will, and other witnesses. The subscribing witnesses being placed by the law around the testator, at the time of the execution of his will, for the special purpose, among others, of ascertaining and judging of his capacity, they are permitted to testify as to the opinion they formed at the time, of the condition of his mind,—whether it was sound or unsound. And if they are persons of intelligence and veracity their opinions are always entitled to great weight with the jury. Other witnesses may testify to his behavior, his conduct, and conversations, his appearance, and to particular facts, tending to throw light on the state of his mind, and from which its condition can be fairly inferred,— but they can not testify to their opinion merely, of his capacity, without also stating the facts upon which that opinion is founded; and if the facts do not fully and clearly warrant that opinion, the opinion must go for nothing, for it is the fact, and not the opinion, upon which you must rely, in forming your judgment.

Medical witnesses may also testify as to the effect of disease on the mind, and their opinions on the question of mental capacity may be given in evidence, and are in many

instances, entitled to consideration and respect. But the value and weight of such testimony, must necessarily depend upon the professional *character* and *standing* of the witness. If he be a person of more than ordinary intelligence and learning in his profession, of undoubted sobriety and correctness of judgment, and of great experience, in regard to diseases affecting the mind, his opinions are justly entitled to the respectful consideration of the jury. But if the medical witness be a person of small learning and experience, in regard to diseases affecting the mind, or is a man of crude and visionary notions or theories, his opinions are entitled to no weight whatever.

In this case, it is very apparent that there exists considerable conflict between the views and opinions expressed by the several medical gentlemen who have been examined; and as the jury, with their limited and imperfect knowledge on the subject, can not safely undertake to decide between them, or to reconcile this conflict, their opinions are entitled to but little, if any weight. I now recur to the question—What is meant by "sound and disposing mind and memory?"

And here, I may remark, generally, that there are evidently many varying grades of mental capacity—ranging from weak to strong—from the lowest to the highest degree of intelligence.

Intellectual feebleness alone, or mere weakness of the understanding, whether this condition of the mind be natural, or the result of an injury, or of disease, does not disqualify a person from making a valid will.

A partial failure of mind or memory, that is to say, even a failure of mind or memory, to a considerable extent, whether it arise from an attack of apoplexy or a paralysis, or from any other cause, is not, in itself, sufficient ground for setting aside a will, if there still remains sufficient mind and memory to enable the testator to comprehend and understand what he is about, or what he is doing. If he is able to understand that he is disposing of his estate by his will, and to whom he is disposing of it, however weak his

intellect may be, he is able and competent to make a valid will. And hence, the courts never undertake to measure the size, the degree, or the extent, of a man's understanding or capacity; nor do they ever inquire into the wisdom or the folly, of the dispositions which he may have made of his estate.

The question is not so much as to the degree of mind or memory possessed by the testator, as this: Had he sufficient mind and memory? Had he a disposing mind and memory? Was he capable of recollecting what property he was disposing of, and to whom he was disposing of it? In a word, were his mind and memory sufficiently sound to enable him to know, and understand, the business in which he was engaged, at the time when he executed his will.

In the case of *Chandler et al. v. Ferris*, decided by this court in the year 1834, Chief Justice, Thomas Clayton, after stating the case and reviewing the evidence, instructed the jury, "that if they were of opinion from the evidence that the testator was capable of exercising thought, and judgment, and reflection—if he knew what he was about, and had memory and judgment—his will could not be invalidated." 1, *Harr.* 464.

In the case of *Masten v. Anderson et al.*, decided in 1836, Chief Justice, Thomas Clayton, charged the jury, that if the testator understood that he was making a will, and had mind enough to comprehend what was implied in that act, it was sufficient, and the will should stand. 2, *Harr.* 381.

In the case of *Sutton v. Sutton et al.*, decided in this court in the year 1854, Chief Justice, Harrington, charged the jury, that testable capacity on the part of the testator, Sutton, "amounted to nothing more than a knowledge of what he was about, and how he was disposing of his property, and the purpose so to do it." 5, *Harr.* 461.

In considering and determining the question of capacity, the time when the will was executed, is the material point to which the jury must look, to ascertain the state and condition of the testator's mind. For, although he may have

been incapable at any time before, or after that period, yet, if he had sufficient capacity at the time when the will was executed, his prior or subsequent incapacity, amounts to nothing and the will must stand.

The question therefore, gentlemen, which you are now called upon to decide, lies within a very narrow compass. It is simply this: Whether the testator, Thomas Jamison, on the third day of June, A. D. 1864, at the time when the will, now in issue before you, was executed by him, had sufficient mental capacity, that is, mind and memory, to make a valid will?

The presumption of law is in favor of his capacity; the burden of showing want of capacity rests on those who oppose the will; and it is incumbent on them to show such incapacity, by satisfactory proof.

If, therefore, you should be satisfied from the evidence, that the mind and memory of the testator, at the time when he executed his will of the third of June, 1864, were not sufficiently sound to enable him to know, and understand, what he was about, or what he was doing, your verdict should be against the will.

But if, on the contrary, you should be satisfied from the evidence, that the mind and memory of the testator, at the time when he executed his will of the third of June, 1864, were sufficiently sound to enable him to exercise thought, reflection, .and judgment, and to know and understand what he was about, or what he was doing, then his will ought to stand, and your verdict should be in favor of its validity.

After a day and night's deliberation, the jury being unable to agree upon a verdict, were discharged by. the court.